# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

HUNTER QUINN NEWBERRY,

        Defendant.

Case No. 24-cr-1026-LTS

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

**TABLE OF CONTENTS**

Page

*I.*     *INTRODUCTION* ............................................................................ 2

*II.*    *FINDINGS OF FACT* ..................................................................... 3

*III.*   *DISCUSSION* ............................................................................... **12**

     *A.*     *Parties' Arguments* ............................................................ **12**

     *B.*     *Relevant Law* .................................................................... **13**

     *C.*     *Analysis* ........................................................................... **16**

         *1.*     *Was there a search?* ................................................. **16**

         *2.*     *Was there probable cause before Rico's nose and head entered the open window?* .......................................................... **25**

         *3.*     *Application of the exclusionary rule* ......................... **35**

*IV.*    *CONCLUSION* .............................................................................. **40**

Case 2:24-cr-01026-LTS-MAR   Document 33   Filed 10/28/24   Page 1 of 40

# I.    INTRODUCTION

On August 6, 2024, the Grand Jury returned an Indictment charging Defendant with one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A).  (Doc. 3.)  The matter before me is Defendant's motion to suppress.  (Doc. 23.)  The motion was filed September 16, 2024, and included a list of items to be suppressed.  (*Id.*)  The Government timely filed a response on September 23, 2024.  (Doc. 26.)  The Honorable Leonard T. Strand, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on October 1, 2024.  (Doc. 28.)

The motion arises from law enforcement's search of the car Defendant was driving.  Following an open-air sniff by drug dog Rico, law enforcement searched the vehicle and recovered drugs.  Rico put his nose and head into the vehicle's open driver's side window without consent and before sitting; i.e., his final indication of the suspected presence of narcotics.

Defendant moves to suppress any evidence obtained from the allegedly unlawful search on January 27, 2024, including any statements which followed the unconstitutional intrusion into his vehicle.  (Doc. 23.)  Evidence he seeks to suppress includes: methamphetamine, marijuana, and drug paraphernalia seized from his vehicle, any statement Defendant made following the search of his vehicle, and the contents of his cell phone.  (*Id.*)

At the hearing Government's Exhibit 1, and Defendant's Exhibit A were admitted without objection.

2

The Government called Dubuque Police Department Investigator Chad Leitzen[1] and Dubuque County Sheriff's Deputy Lucas Pothoff.[2]  I found both witnesses credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    FINDINGS OF FACT

In late November 2023, Investigator Leitzen was provided information on Defendant from a confidential informant ("CI") who contacted the Drug Task Force to provide information regarding a friend's drug overdose.  CI1[3] told Investigator Leitzen that Defendant was coming to Dubuque from Wisconsin and selling large amounts of fentanyl pills.[4]  Specifically, CI1 stated that Defendant would bring 2,000 fentanyl pills

---

[1] Investigator Leitzen is employed by the Dubuque Police Department and is currently assigned to the Dubuque Drug Task Force.  He has been assigned to the Drug Task Force for 11 years. Prior to his assignment with the Drug Task Force, Investigator Leitzen was a patrol officer for 10 years.  He has extensive training in drug interdiction and drug investigation.

[2] Deputy Pothoff has been employed by the Dubuque County Sheriff's Office since January 2017. He is currently assigned as a canine handler for the road patrol division.  Deputy Pothoff and his dog, Rico, were initially certified and trained from October 2022 through December 2022 at Jessiffany Canine Services in Wisconsin.  They are both also certified through the American Police Canine Association.  I note that the timing of the American Police Canine Association certification was not addressed by either party and Defendant makes no argument that Deputy Pothoff and Rico were not properly certified at the time of the dog sniff.

[3] Investigator Leitzen received information regarding Defendant from three different confidential informants.  To distinguish the three different confidential informants, I will refer to them as "CI1," "CI2," and "CI3."

[4] CI1 has subsequently continued to work with Investigator Leitzen and the Dubuque Drug Task Force.  Investigator Leitzen testified that CI1 is reliable and trustworthy and CI1's information has been corroborated and used in several cases.  CI1 has also performed work for the Drug Task Force conducting undercover drug buys.  After initially contacting the Drug Task Force to provide information to help solve the drug overdose of a friend, CI1 continued to work with the Drug Task Force as a cooperating individual, seeking possible leniency for a drug possession charge.

3

at a time from Madison, Wisconsin, to Dubuque, and sell them from a house on Lemon Street in Dubuque. (Leitzen Hr'g Test. at 4.)

On January 20, 2024, CI2[5] contacted Investigator Leitzen and asked whether Investigator Leitzen had heard of Defendant who lived on Lemon Street. CI2 told Investigator Leitzen that if he had not heard of Defendant, Investigator Leitzen should start looking into him because Defendant was selling "huge amounts" of methamphetamine in Dubuque. (*Id.* at 6.) CI2 stated that, on January 18, 2024, he had observed Defendant with a gallon-size Ziploc bag full of methamphetamine. CI2 also stated that Defendant had been bragging about selling pounds of methamphetamine in Dubuque. Further, CI2 stated that Defendant's supplier was a female who lived two hours away, but CI2 had no other details. (*Id.*)

On January 22, 2024, Investigator Leitzen spoke on the phone with CI3[6], who told Investigator Leitzen that Defendant was dealing "huge amounts" of methamphetamine in Dubuque and had openly bragged to CI3 about bringing 6 to 10 pounds of methamphetamine at a time to Dubuque from Madison. (*Id.* at 8.) After speaking with CI3, Investigator Leitzen called CI1 and asked if CI1 had any more information regarding Defendant. CI1 told Investigator Leitzen that Defendant was selling "large amounts" of methamphetamine in Dubuque and that Defendant's supplier in Platteville, Wisconsin had

---

[5] CI2 is a cooperating individual with the Dubuque Drug Task Force, seeking possible leniency on a drug charge. The Drug Task Force had conducted an undercover buy of methamphetamine from CI2 in the past. CI2 has also conducted undercover drug buys for the Drug Task Force and CI2's information has been corroborated regarding individuals involved in drug distribution in Dubuque.

[6] CI3 is a cooperating individual with the Dubuque Drug Task Force, seeking possible leniency on charges of maintaining a drug house and possession of a controlled substance. CI3 has provided corroborated information on various individuals involved in methamphetamine and fentanyl distribution in Dubuque. CI3 has also conducted undercover drug buys for the Drug Task Force and assisted in several drug cases.

Case 2:24-cr-01026-LTS-MAR    Document 33    Filed 10/28/24    Page 4 of 40

been arrested and Defendant was now obtaining his drugs from a girl in Wisconsin but CI1 did not know who she was. (*Id.* at 10.) Investigator Leitzen spoke to CI1 again, on January 24, 2024, and CI1 told Investigator Leitzen that she had observed Defendant in possession of several ounces of methamphetamine. (*Id.*)

On January 26, 2024, CI1 contacted Investigator Leitzen and told Investigator Leitzen that Defendant was at an apartment building on the corner of Key Way and Hillcrest in Dubuque. CI1 stated that Defendant had a large amount of cash and was preparing to leave shortly for Madison to pick up a "large amount" of methamphetamine to bring back to Dubuque. (*Id.* at 11.) CI1 indicated that Defendant would be driving one of the vehicles parked behind the apartment building but CI1 did not know which one. At the time Investigator Leitzen spoke with CI1, Investigator Matt Sitzmann was near the apartment building. Within minutes of speaking with CI1, Investigator Leitzen asked Investigator Sitzmann to drive by the parking lot and identify the vehicles parked in the lot. Investigator Sitzmann drove past the parking lot and video recorded three cars parked in the lot. Approximately 15 minutes after first speaking with Investigator Leitzen, CI1 again contacted Investigator Leitzen to inform him that Defendant had left the apartment building. Investigator Sitzmann returned to the parking lot and observed that one of the three vehicles, a silver Volkswagen Jetta, was gone. A few blocks from the apartment building, Investigator Sitzmann observed the silver Jetta pull into a McDonald's parking lot. He took a picture of the vehicle, which included the vehicle's license plate. Investigator Letizen entered the license plate number into an electronic license plate reader tracking system and about an hour later determined that the Jetta was traveling eastbound on Highway 151 past Platteville and heading toward Madison.

The next day, on January 27, 2024, between 4:30 p.m. and 5:00 p.m., an off-duty Drug Task Force Investigator, Austin Weitz, observed the Jetta parked next to his car in a Walmart parking lot. Investigator Weitz notified Investigator Leitzen. Investigator

Weitz also photographed the driver of the Jetta and sent it to Investigator Leitzen. Investigator Leitzen sent the photo to a detective in Wisconsin who was familiar with Defendant, and he confirmed for Investigator Leitzen that the driver of the Jetta was Defendant.

Investigator Letizen had knowledge of two arrest warrants for Defendant. One was an extraditable arrest warrant from Wisconsin for burglary. The other was a nonextraditable arrest warrant from Arkansas for drugs. Investigator Leitzen contacted law enforcement radio dispatcher ("dispatch") and asked to verify the Wisconsin arrest warrant.

Investigator Weitz observed the Jetta leave the Walmart parking lot but did not follow it. Investigator Weitz told Investigator Leitzen the direction the Jetta was heading, and Investigator Leitzen was able to locate the vehicle. Investigator Leitzen followed the Jetta and updated dispatch with the vehicle's location. Dubuque County Sheriff's Deputy Trevor Boge was in the area and informed Investigator Leitzen that he would assist in making a traffic stop on the Jetta. Investigator Leitzen observed the Jetta go through the drive-thru at a Culver's restaurant. When Defendant left the Culver's, he began driving southbound on Holliday Drive, and Deputy Boge was able to get behind the Jetta to make a traffic stop. The stop occurred in Lina's Thai Bistro parking lot, which is directly off Holliday Drive.

Investigator Leitzen was in his vehicle behind Deputy Boge at the time the traffic stop was initiated. Investigator Leitzen spoke with the passenger, Logan Taylor. Taylor confirmed Defendant was the driver of the vehicle and told Investigator Leitzen that she had been with Defendant most of the day and that he had picked her up in Madison and then drove her to Dubuque. She stated that they returned to Dubuque from Madison on January 27, 2024. (*Id.* at 40.) She did not know where Defendant had been staying in Dubuque.

6

Deputy Boge spoke with Defendant. Initially, Defendant was uncooperative with Deputy Boge. Deputy Boge mistakenly thought Defendant's last name was "Mayberry," not "Newberry." When Deputy Boge asked Defendant whether he was Hunter Mayberry, Defendant told Deputy Boge that he was not Hunter Mayberry. Over the next twenty minutes, Defendant refused to give Deputy Boge his identification and called his mother and the owner of the Jetta, Ronald Welp, asking them to tell Deputy Boge that he was not Hunter Mayberry. After speaking with Taylor, Investigator Leitzen spoke with Defendant and told Defendant that he knew he was Hunter Newberry and Defendant confirmed that he was Hunter Newberry. Investigator Leitzen also told Defendant that he was going to be arrested on the Wisconsin warrant.

Investigator Leitzen asked Defendant for his consent to search the vehicle. Investigator Leitzen believed there was a large quantity of drugs in the car. Defendant denied consent, stating that the car did not belong to him. Investigator Leitzen asked Defendant to contact the vehicle's owner so that he could ask the owner for consent to search the vehicle. Defendant called Welp and told him that Investigator Leitzen wanted consent to search the vehicle, but Defendant had already denied consent. Investigator Leitzen believed that Defendant was trying to direct Welp not to give consent to search the car. (*Id.* at 21.)

Ultimately, Defendant was removed from the car and arrested on the outstanding Wisconsin warrant. Defendant's person was searched incident to arrest. Investigator Leitzen found a wad of cash in his pants pocket totaling $1,200 in $20 bills. Investigator Leitzen believed that the money was "highly likely" to be related to the drug trade. (*Id.* at 22.) Investigator Leitzen also located $1,485 in Defendant's wallet, consisting of eleven $100 bills, nineteen $20 bills, and one $5 bill. When asked about the money, Defendant, who stated he was not currently employed, said he saved it up from working

7

at Buffalo Wild Wings but could not say how long ago he had been working there. (*Id.* at 23.)

After speaking with Taylor and just prior to speaking with Defendant, Investigator Leitzen called Dubuque County Sheriff's Deputy Lucas Pothoff and asked him to bring his canine to the scene of the traffic stop for a free-air dog sniff. Investigator Leitzen told Deputy Pothoff that Defendant had been stopped and he believed the Defendant's vehicle contained a "large amount" of methamphetamine. (*Id.* at 24.) Deputy Pothoff told Investigator Leitzen that he was presently conducting an interview with a woman he had arrested who was providing information about Defendant. The woman told Deputy Pothoff that Defendant was bringing multiple pounds of methamphetamine to Dubuque from Platteville and that she had money to give Defendant for methamphetamine when he returned to Dubuque.[7] (*Id.*) Deputy Pothoff left the interview and went with his canine to the scene of the traffic stop. Ultimately, as will be discussed in greater detail below, Deputy Pothoff and his canine performed a free-air sniff around Defendant's vehicle. The dog provided a final indication on the vehicle and Investigator Leitzen searched the car. Investigator Leitzen testified that he did not search the vehicle until after Deputy Pothoff had informed him that the dog had made a final indication. (*Id.* at 41.) In the middle of the backseat of the vehicle, Investigator Leitzen found a backpack which contained approximately 1.7 pounds of methamphetamine. After *Mirandizing* Defendant, Defendant confirmed that he obtained the methamphetamine in Madison and brought it to Dubuque to sell. (*Id.* at 25-26.)

---

[7] At the hearing, Deputy Pothoff also testified regarding his interview with the woman he had arrested earlier that day. The woman told Deputy Pothoff that she had purchased illegal narcotics from Defendant in the past and had seen Defendant with large amounts of illegal narcotics in the past. (Pothoff H'rg Test. at 62.) She also told Deputy Pothoff that Defendant was bringing a large amount of illegal narcotics to Dubuque on that day, January 27, 2024. (*Id.*) She stated that she knew Defendant bought illegal narcotics in bulk, typically a pound or more, and Defendant was moving that amount of weight daily or every other day. (*Id.*)

Deputy Pothoff's free-air dog sniff of Defendant's vehicle requires further description. Deputy Potoff's canine, Rico, is trained to detect the odors of marijuana, cocaine, crack cocaine, methamphetamine, heroin, MDMA (ecstasy), and fentanyl. Rico is also a dual-purpose dog, meaning that in addition to narcotic detection, he is also trained in tracking and apprehension of individuals.

For a drug sniff, Deputy Pothoff and Rico start on the downwind side of the area to be sniffed and move counterclockwise. Rico is trained to find the strongest source of the odor of narcotics. Deputy Pothoff testified that when Rico is in the presence of the odor of illegal narcotics, Rico engages in noticeable behavioral changes. Such changes include: (1) Rico will stop walking; (2) Rico will have head throws; (3) Rico's body will turn; (4) Rico will face the vehicle instead of walking parallel to it; (5) Rico will leave his front feet; and (6) Rico will look up toward an odor that is emanating from above him. Rico's final indication is to sit. Deputy Pothoff noted that sometimes Rico does not sit and make a final indication. When this occurs, but based on Rico's changes of behavior and respirations, Deputy Pothoff is able to determine whether Rico has made a positive alert for narcotics. (Pothoff Hr'g Test. at 49.) Deputy Pothoff stated that the reasons Rico may not sit include: the concrete being very hot, very cold, or uneven.

At the traffic stop, Deputy Pothoff took Rico to the front of Defendant's vehicle. Deputy Pothoff gave Rico the command to sniff the vehicle. Rico walked quickly down the driver's side of the car. Because he walked too quickly, Deputy Pothoff directed Rico back to the bottom seam of the driver's door. Rico took a deep breath at the bottom of the driver's door. Deputy Pothoff continued to move along the car, but Rico remained at the driver's side door sniffing and then lifted his head and began moving up towards

9

the open driver's door window.[8]  Eventually, Rico left his front feet[9] and stuck his nose and head inside the vehicle through the open driver's door window.  (Def. Ex. A at 4:42-4:57.)  After crossing the plane of the open driver's door window, Rico returned to the ground and kept sniffing down the rear driver's side door seam and positively indicated by sitting next to the rear driver's side door.  (*Id.* at 4:57-5:12.)

Deputy Pothoff noted the following changes of behavior in Rico before he entered the open driver's door window: (1) Rico stayed at the driver's side door sniffing and did not follow Deputy Pothoff down the vehicle; (2) Rico turned and faced the vehicle with his chest toward the vehicle instead of remaining parallel to the car;[10] (3) Rico's nose went up because the strongest point of the odor was coming out of the window; and (4) Rico left his front feet.[11]  (Pothoff Hr'g Test. at 59.)  When asked whether he would be comfortable reporting to other officers that Rico detected the odor of narcotics based on the four changes of behavior discussed above and before Rico's nose and head broke the plane of the open window, Deputy Pothoff responded:

---

[8] Deputy Pothoff testified that he was unaware of any law enforcement officer requiring the driver's window to be rolled down.  Deputy Pothoff also stated that he did not manipulate the window or roll it down.  (Pothoff Hr'g Test at 56-57.)

[9] The term "leave his feet" means the dog is bringing his front feet off the ground.

[10] Deputy Pothoff testified that the first two changes of behavior, Rico staying by the driver's side door sniffing and Rico turning toward the vehicle with his chest facing the vehicle indicated that Rico was "in the presence of the odor of a narcotic and that his full attention [was] on the vehicle in front of him."  (Pothoff Hr'g Test. at 54.)  Deputy Pothoff also noted that if Rico did not smell the odor of narcotics, he would have stayed parallel to the vehicle and not turned toward the vehicle with his chest facing the vehicle.  (*Id.*)

[11] Deputy Pothoff testified that the last two changes of behavior, Rico lifting his head and leaving his front feet, indicated that the strongest point of the odor was coming from above Rico.  (Pothoff Hr'g Test. at 55-56.)  Deputy Pothoff also stated that leaving his feet "for K-9 Rico, [is] a major change of behavior for him."  (*Id.* at 56.)  Further, Deputy Pothoff stated that when Rico leaves his front feet "it is almost always followed by a positive alert."  (*Id.* at 71.)

10

In that sniff, hypothetically speaking, if time stopped, when his feet were about to hit that window, time just stopped, I can confidently say he is going to positively alert on that vehicle based on what I saw before and with his— him leaving his feet like that. Training with K-9 Rico, deployments with K-9 Rico, I know the dog, when he does that, he's in odor. He's going to alert. So, yeah, I'd be able to call it there.

(*Id.* at 78.) However, Deputy Pothoff did not inform Investigator Leitzen or the other officers that Rico had alerted until after Rico sat, his final indication. (*Id.* at 79.) The vehicle was not searched until after Rico sat and gave his final indication. (*Id.* at 68.)

Additionally, Deputy Pothoff testified that Rico is not trained to jump into doors or onto doors during a drug sniff. He also testified that Rico is not trained to jump through windows when conducting a dog sniff. Further, Deputy Pothoff testified that Rico is not trained to enter vehicles during a dog sniff. (*Id.* at 57, 61.) Deputy Pothoff also noted that Rico is not trained to leave his feet but is trained to find the source of an odor of illegal narcotics and if such odor is coming from above Rico, he will leave his feet. (*Id.* at 61.) However, Deputy Pothoff stated that while Rico was not trained to enter a vehicle, he was also not trained to avoid entering the interior of a vehicle. (*Id.* at 71.) Deputy Pothoff explained that:

[Rico's] allowed to work and free to work. It is a fine line when it comes to corrections in that area. He is a dog, like we have talked about. A correction to him, if I shout no and give him a hard leash tug in a correction, in that sense he could think that means whatever odor he is smelling he should never smell again, that he's not correct on that, that there are no drugs inside of that vehicle. So that's why he's allowed to freely work in that sense. He wouldn't necessarily know that correction is for him leaving his feet.

(*Id.*) Further, Deputy Pothoff stated that Rico is not "discouraged" from sticking his head in the open window of a car when he is in the presence of the odor of an illegal narcotic. (*Id.* at 72.)

### III.   DISCUSSION

#### A.   Parties' Arguments

Defendant points out that it "is unquestionable that Rico stuck his head and snout into the vehicle while conducting the free-air sniff." (Doc. 23-1 at 3.)  Defendant notes that under *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007), the Eighth Circuit Court of Appeals "found no Fourth Amendment violation where a K-9 invades the vehicle's interior." (*Id.*)  Defendant maintains, however, that *Lyons* was decided before *United States v. Jones*, 565 U.S. 400 (2012), a case where the Supreme Court held that the installation of a GPS device on a target's vehicle, and using the GPS device to monitor the vehicle's movements constituted a search under the Fourth Amendment, and it is now "questionable whether *Lyons* survived *Jones*." (*Id.*)  Relying on *United States v. Buescher*, 691 F.Supp.3d 924 (N.D. Iowa 2023), Defendant points out that this Court determined that *Lyons* did not control and the canine's entrance into a vehicle through an open window constituted a trespass and a warrantless and unreasonable search.  (*Id.* at 4.)  Defendant argues that "[c]onsistent with . . . *Buescher*, . . . [the] Dubuque law enforcement officers, through their K-9 agent, . . . trespassed into his vehicle, and that they did so without the necessary probable cause," resulting in "an unconstitutional warrantless search, and all evidence obtained as a result should be suppressed, including fruits of the poisonous tree." (*Id.* at 4-5.)

The Government argues that "probable cause existed to search the vehicle before Rico's nose entered the vehicle window." (Doc. 26 at 6.)  Specifically, the Government, relying on *United States v. Holleman*, 743 F.3d 1152 (8th Cir. 2014), argues that:

> Prior to the free-air sniff, officers were informed the defendant left the day before to travel to Madison, Wisconsin to obtain drugs. . . .  Officers located defendant back in Dubuque the next day and conducted a traffic stop. . . .  Defendant's passenger confirmed that she had been with the defendant in Madison, Wisconsin earlier that day. . . .  During the search of defendant he possessed $2,685 in United States Currency. . . .  Here,

12

Rico alerted before putting his nose through the open window. . . .  Based on the totality of the circumstances, officers possessed probable cause to search defendant's vehicle.

(*Id.* at 7-8.)

Next, relying on *Lyons*, the Government argues that "Rico putting his nose through the open window was not a trespass, and it was not a basis for suppressing evidence." (*Id.* at 8.)  In *Lyons*, the Eighth Circuit held that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment."  486 F.3d at 373.  The Government acknowledges that in *United States v. Pulido-Ayala*, 892 F.3d 315, 319 (8th Cir. 2018), the Eighth Circuit stated there was reason to doubt *Lyons* holding.  (Doc. 26 at 12.)  However, the Government maintains that "*Pulido-Ayala* did not overrule the 2007 *Lyons* decisions, and the Eighth Circuit has not overruled *Lyons*," and therefore, under *Lyons*, Rico's action of putting his nose and head through the open window of the vehicle was not a violation of the Fourth Amendment.  (*Id.*)

Finally, the Government argues that "the exclusionary rule should not be applied here."  (*Id.*)  Relying primarily on *Davis v. United States*, 564 U.S. 229 (2011) and *United States v. Handley*, No. 23-CR-57-CJW-MAR, 2024 WL 1536750 (N.D. Iowa Apr. 9, 2024), the Government contends that because *Lyons* has not been overruled, officers can properly rely on *Lyons's* holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment."  (Doc. 26 at 12-16.)  The Government asserts that "the conduct of the officers was neither deliberate nor culpable, and no police misconduct occurred," therefore, "the exclusionary rule should not apply here."  (*Id.* at 16.)

**B.    *Relevant Law***

The Fourth Amendment protects persons against unreasonable searches and seizures.  U.S. Const. amend. IV.  Warrantless searches are per se unreasonable, with a

13

few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id*. at 1140-41 (citations omitted); *see also United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006) ("The warrantless search of a vehicle is constitutional pursuant to the automobile exception to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence before the search began.") (Quotation omitted)). The burden is on the Government to justify a warrantless search. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *United States v. Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d 280, 287-88 (8th Cir. 2003).

A dog sniff of the exterior of a vehicle during a stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person

or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010); *see also United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) (providing that "the handling officer testified [his dog] gave two definitive 'alerts' to the side of [the defendant's] truck" and "[a]s a result, we are not concerned about [the dog's] failure to give a full indication"); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (holding that the positive indication of a reliable drug dog, alone, is enough to establish probable cause). A drug dog is considered reliable when it has been "trained and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (citation omitted). In explaining what is necessary to prove a dog's reliability the Supreme Court stated:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Florida v. Harris*, 568 U.S. 237, 246-47 (2013). The standard to establish probable cause "is no more demanding where police search an automobile based on probable cause without a warrant." *Olivera-Mendez*, 484 F.3d at 512. However, the court must also consider evidence that may detract from the dog's reliability. *See Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (Quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). The relevant question is "whether all the facts surrounding a dog's alert [or indication], viewed through the lens of common sense, would make a

reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

## C.  *Analysis*

### 1.  *Was there a search?*

First, when Rico's nose and head entered Defendant's vehicle through the open driver's door window, was Defendant's right to be free of unreasonable searches violated?  In *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007), law enforcement stopped a vehicle for speeding.  *Id.* at 369.  After speaking separately with the driver and passenger, and after the driver declined to allow the state trooper to search the vehicle, the trooper requested a K-9 unit.  *Id.* at 370.  The K-9 unit arrived, and the canine officer gave his dog the command to search, and they walked around the vehicle.  *Id.*  The front windows of the vehicle were open.  *Id.*  During the "initial trip around the van, [the dog] alerted several times and nearly indicated to the presence of narcotics" and on the "second lap around the van, [the dog] stuck his head through the open passenger-side window and then sat down beside the front passenger door, his indication that he had found the strongest source of the odor of narcotics."  *Id.*  The vehicle was searched, and law enforcement found 106 pounds of marijuana and $29,685 in cash.  *Id.*

The defendants argued that the trooper that stopped their vehicle:

> created the opportunity for the dog to breach the interior of the vehicle because [the defendants] opened the windows as a direct result of the traffic stop, and that [the canine officer] improperly directed the canine into the vehicle's open passenger-side window.

*Id.* at 373.  The Eighth Circuit determined that:

> The district court did not err when it found that [the trooper who stopped the defendants] did not create the opportunity for the dog to breach the interior of the vehicle.  The district court found that [the passenger] opened the passenger window without any verbal order or request from [the

16

trooper], and that there were no orders by [the trooper] to keep the windows open. The video supports the district court's findings.

[The defendants] do not cite to any authority that holds that the officers had the affirmative duty to close the windows in preparation for the dog sniff, and we find none. . . .

Further, the district court's determination that [the canine officer] did not direct the dog to stick his head through the window of the van was supported by the evidence. Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment. *United States v. Reed*, 141 F.3d 644, 650 (6th Cir.1998); *United States v. Lyons*, 957 F.2d 615, 617 (8th Cir.1992); [*United States v.*] *Stone*, 866 F.2d [359,] 364 [10th Cir. 1989)]. [The canine officer] testified about his training and experience, and stated that he knew that he could not direct the dog to enter the vehicle without a warrant or the owner's consent. He further testified that he directed the dog to sniff at various locations on the exterior of the van, but that when [the dog] stuck his head through the window, "That's on his own. He was not directed inside the vehicle." The district court found [the canine officer's] testimony to be credible, and that "the actions of [the officer] at that point in the sniff were not different because the window was open. . . ."

The video . . . support[s] the district court's determination that the dog would have ultimately indicated on the van even if he had not stuck his head inside the window. In *Lyons*, we found that when a dog's alert was inevitable, the sniff did not become an illegal search when the dog tore into a package and spilled out its contents. *Lyons*, 957 F.2d at 617. We stated, "Given the certainty that the course of action the police were pursuing at the time of the [dog sniff] would have led to discovery of the same evidence forthwith by unquestionably legal means, there is no reason to penalize the police for this accident by excluding evidence." *Id*.

The district court found that "with the window open there is little doubt from the evidence here that [the dog] would have smelled the odor of the drugs in this case even if he had been reined back and held outside the plane of the window track." Further, the district court found credible [the canine officer's] interpretation of the dog's actions during the first lap around the vehicle as indicating that the odor was emanating from the vehicle. [The

canine officer] explained that the dog continued sniffing until he found the strongest source of the odor, which was consistent with the dog's training. The district court concluded, "the open window would still have been the strongest source for the odor, and [the dog] would have indicated to that area of the vehicle, just as he did."

The video supports [the canine officer's] testimony, as it shows the dog alerting to several areas of the van and almost indicating at the rear of the van before ultimately sticking his head through the window. [The officer] can be heard on the video saying that the dog is smelling drugs "essentially everywhere." The fact that the dog stuck his head through the window does not change the result here.

*Id.* at 373-74 (fifteenth alteration in original).

Here, it appears from both the testimony and the video evidence that Rico acted instinctively when he put his nose and head through Defendant's vehicle's open driver's door window. Further, Deputy Pothoff did not direct Rico into the open window. Moreover, Deputy Pothoff testified that Rico has not been trained to jump into doors or onto doors, jump through windows, or jump into or enter vehicles during a dog sniff. (Pothoff Hr'g Test. at 57, 61.) However, Deputy Pothoff also stated that Rico is not "discouraged" from entering through an open car window when he is in the presence of the odor of an illegal narcotic. Deputy Pothoff explained that because "[a] correction to him, if I shout no and give him a hard leash tug in a correction, in that sense he could think that means whatever odor he is smelling he should never smell again, that he's not correct on that, that there are no drugs inside of that vehicle." (*Id.* at 71-72.) Even though Deputy Pothoff did not discourage Rico from putting his nose and head through the open window of the vehicle, Deputy Pothoff did not direct Rico to enter the vehicle or appear to engage in any police misconduct. Thus, under *Lyons*, there is no Fourth Amendment violation. 486 F.3d at 373 ("Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment.").

18

However, in *United States v. Pulido-Ayala*, 892 F.3d 315 (8th Cir. 2018), the Eighth Circuit called *Lyons* into question. In *Pulido-Ayala*, following a traffic stop, the defendant was asked to leave his vehicle prior to a free air dog sniff. *Id*. at 317-18. The defendant exited the vehicle and walked away from the car without shutting the door. *Id*. at 318. The canine officer brought his dog to the rear of the defendant's vehicle and told the dog to:

> "find it"—the signal to begin the sniff—and the dog immediately pulled [the officer] toward the open door on the passenger's side. [The dog] jumped into the car through the opening and "alerted" (i.e., signaled the presence of drugs) at the fender area. [The officer] pulled the dog out of the opening and attempted to walk him clockwise around the vehicle. Again, [the dog] snapped his head back and went through the open door, alerting at the same location. Based on the canine's alert, officers searched the [vehicle] and found three kilograms of cocaine inside the fender of the vehicle.

*Id*. The Eighth Circuit noted that:

> Police ordinarily cannot search the interior of an automobile unless they have probable cause to believe that the vehicle contains contraband or other evidence of a crime. *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *United States v. Ross*, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). A drug dog is an instrumentality of the police, and the actions of "an instrument or agent" of the government normally are governed by the Fourth Amendment. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). It is foreseeable that trained canines will react instinctively to the scent of drugs, and [the defendant] argues with some force that when police bring a dog to a scene with an open car door, and the dog enters a citizen's vehicle, the police have conducted a "search" within the meaning of the Fourth Amendment. *See United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998).

*Id*. at 318-19. The Eighth Circuit explained that:

> The district court thought the *Lyons* cases meant that "the officers' intent is dispositive," so that there was no search if [the dog] acted instinctively and [the canine officer] did not direct him to enter the car. But since the *Lyons*

cases, the Supreme Court has emphasized that with two "limited exception[s]" for special-needs and administrative searches, the subjective intent of police officers is almost always irrelevant to whether an action violates the Fourth Amendment. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted). There is reason to doubt, therefore, whether the district court's reading of the *Lyons* cases endures.

*Id*. at 319 (second alteration in original).

In *United States v. Buescher*, 691 F.Supp.3d 924 (N.D. Iowa 2023), this Court questioned the ongoing viability of *Lyons's* reasoning. In *Buescher*, a canine officer deployed his dog as follows for a free air sniff of a stopped vehicle:

> [The canine officer] led [his dog] around [the defendant's] vehicle three times (he testified he normally does two or three passes when conducting a drug sniff). [The officer] and [his dog] followed their standard pattern by starting at the front passenger headlight and moving counter-clockwise around the vehicle. [The officer] walked backward ahead of [the dog], who was on a four-foot leash. [The officer] testified that on the first pass, [his dog] showed some interest at the driver's door (by smelling longer at that location) but did not provide a positive indication. . . . According to [the officer], [the dog] did not alert or show interest in the [vehicle] on the second pass. On the third pass, [the dog] put his nose in the open driver's window and tried to jump inside twice. [The officer] testified this was an alert by [the dog] that he had found the odor of narcotics. [The officer] prompted [his dog] to "find drugs" and [the dog] gave a positive indication by sitting down and staring.

*Id*. at 927 (quotation omitted). The defendant argued that, based on *United States v. Jones*, 565 U.S. 400 (2012) and *Florida v. Jardines*, 569 U.S. 1 (2013), *Lyons* is no longer good law and the canine officer "conducted a warrantless search because [his dog] trespassed into a place law enforcement was not lawfully allowed to be without a warrant (inside the open window) while intending to obtain information about [the defendant]." *Buescher*, 691 F.Supp.3d at 931.

Before discussing *Buescher* further, I will discuss the holdings in *Jones* and *Jardines*. In *Jones*, the Supreme Court held that the installation of a GPS device on a target's vehicle, and using the GPS device to monitor the vehicle's movements constituted a search under the Fourth Amendment. 565 U.S. at 404. The Supreme Court explained that:

> It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted.

*Id*. at 404-05. In *Jardines*, law enforcement deployed a drug dog on the defendant's front porch without a warrant and the dog indicated at the base of the defendant's front door. 569 U.S. at 4. The Supreme Court held that the "government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' withing the meaning of the Fourth Amendment." *Id*. at 11-12. The Supreme Court explained that:

> The [Fourth] Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred. . . .
>
> That principle renders this case a straightforward one. The officers were gathering information in an area belonging to [the defendant] and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Id*. at 5-6 (internal citations and quotation marks omitted). The Supreme Court further explained that:

> [A] police officer not armed with a warrant may approach a home and
> knock, precisely because that is "no more than any private citizen might
> do."
>
> But introducing a trained police dog to explore the area around the home in
> hopes of discovering incriminating evidence is something else. There is no
> customary invitation to do that. An invitation to engage in canine forensic
> investigation assuredly does not inhere in the very act of hanging a knocker.
> To find a visitor knocking on the door is routine (even if sometimes
> unwelcome); to spot that same visitor exploring the front path with a metal
> detector, or marching his bloodhound into the garden before saying hello
> and asking permission, would inspire most of us to—well, call the police.
> The scope of a license—express or implied—is limited not only to a
> particular area but also to a specific purpose.

*Id*. at 8-9 (internal citations and quotation marks omitted).

Returning to *Buescher*, this Court observed that, "[b]ased on *Pulido-Ayala*, *Jones*
and *Jardines*, it is not apparent that a canine's instinctive actions will never violate the
Fourth Amendment." 691 F.3d at 934. The district court considered, "[i]f a police
officer's intent is normally irrelevant to a constitutional inquiry . . . it is not clear why a
canine's indiscernible motives would define the contours of an individual's right to be
free from Government intrusion." *Id*. at 935. In considering *Jones* and *Jardines*, the
district court noted:

> Returning to *Jones* and *Jardines*, "[w]hen the Government obtains
> information by physically intruding on persons, houses, papers, or effects,
> a search within the original meaning of the Fourth Amendment has
> undoubtedly occurred." *Jardines*, 569 U.S. at 5, 133 S.Ct. 1409. "It is
> beyond dispute that a vehicle is an 'effect' as that term is used in the
> Amendment." *Jones*, 565 U.S. at 404, 132 S.Ct. 945. Intrusion may
> include a mere touching (such as the tracking device in *Jones*) or by
> exceeding a license to a place (such as the bringing a drug-sniffing dog to
> the curtilage of a home in *Jardines*). However, it must be accompanied by
> the intent to gather information.

22

*Id*. at 937.  Applying these considerations to the facts in *Buescher*, the district court determined that:

> [T]here is no doubt that a physical intrusion occurred.  Indeed, before his final alert, [the dog] was actually dangling out of [the defendant's] window. . . .
>
> [The canine officer] himself would not have been constitutionally permitted to enter the vehicle without a warrant.  *See California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).  Similarly, [the dog's] entry into the open window was a trespass with an intent to obtain information.  While canine sniffs enjoy *suis generis* status (*Caballes*, 543 U.S. at 409, 125 S.Ct. 834), they are not exempted from a trespass analysis under *Jardines*.  As the *Jones* Court stated: "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information." *Jones*, 565 U.S. at 404, 132 S.Ct. 945.  The same conduct occurred here.  As such, I find the Government conducted a warrantless and unreasonable search of [the defendant's] vehicle by allowing [the canine officer's dog] to insert his head into the open window of that vehicle.

*Id*. at 937-39.

Recently, in *United States v. Handley*, a case similar to *Buescher*, a canine officer deployed his dog as follows for a free air sniff of a stopped vehicle:

> Officer Tyler Smith, a canine handler with the CRPD was asked to report to where Defendant's vehicle was stopped by other officers. . . .  Officer Smith had his dog Lara, a three-year-old, 75-pound Dutch Shepard, with him.  Officer Smith and Lara were west of the vehicle about 15 to 20 feet when Officer Smith gave her a command to commence the open-air sniff. . . .
>
> Officer Smith observed changes in Lara's behavior after giving her the search command.  First, he noted closed-mouth breathing followed by an aggressive or quick pull toward the front grille of the suspect vehicle where Lara began to sniff.  Officer Smith then noticed Lara snap her head back toward the driver's side of the vehicle.  Officer Smith testified, based on

23

his observations during drug searches, that the snapping was caused by her efforts to return to a "scent cone" she had left.

When Lara reached the driver's wheel well area, Officer Smith noticed a very aggressive sniffing pattern, closed-mouth sniffing pattern which was inconsistent with her normal breathing through her mouth. Lara then progressed beyond the vertical door seam between the driver's side front and rear doors. Lara's head then snapped back again, this time up and to the left. Officer Smith described the snap as an effort to find the strongest source of odor. Officer Smith testified that if we could freeze time, I would have been able to articulate and say we had probable cause to search the vehicle when she snapped her head back to the vertical door seam and started going up to the window.

At this point Lara put her nose in the driver's window. Officer Smith estimated that Lara's entire head did not enter the vehicle. Rather, her nose went in approximately to her eyes; i.e., about 4-6 inches. . . . Lara's back feet remained on the ground, but her front feet were on the outside of the driver's door as her nose was in the window. . . . Lara then immediately sat. Officer Smith's body movement looks as though he intended to continue around the back of the vehicle, but Lara's sit appeared firm. Officer Smith deemed this "an indication" of the presence of drugs and rewarded her with her ball as is his standard procedure. . . .

2024 WL 1536750, at *2-*3 (quotations and citations omitted). *Handley* determined that:

Here, as in *Buescher*, this [c]ourt finds that a warrantless, unreasonable search of defendant's vehicle occurred. There is no doubt that a physical intrusion or trespass occurred. Indeed, before her final indication, Lara's nose crossed the plane of defendant's open vehicle window. Lara is an instrumentality of the police, and the government conducted a warrantless, unreasonable search by allowing Lara to insert her nose inside defendant's open vehicle window for the purpose of obtaining information short of a final indication. Thus, . . . under *Buescher*, the government conducted a warrantless, unreasonable search of defendant's vehicle.

*Id.* at *7.

24

As in *Buescher* and *Handley,* it is undisputed and the video evidence shows Rico's nose and head crossed the plane of the open car window before his final alert; and thus, a physical intrusion or trespass occurred. Also, like in *Buescher* and *Handley*, Rico's trespass was for the purposes of obtaining information. He had been given the command by law enforcement to seek narcotics and was actively engaged in that pursuit when his nose and head entered the window. Thus, consistent with both *Buescher* and *Handley*, I find that the Government conducted a warrantless and unreasonable search of Defendant's vehicle.

**2.      *Was there probable cause before Rico's nose and head entered the open window?***

The Government argues that, even if Rico's nose and head crossing the plane of Defendant's vehicle's open window constitutes a trespass, "probable cause existed to search the vehicle before Rico's nose entered the vehicle window." (Doc. 26 at 6.) The Government asserts that Rico "alerted before putting his nose through the open window." (*Id.* at 8.)

In *United States v. Holleman*, a state patrol trooper initiated a traffic stop on the defendant's vehicle for speeding and following too closely behind another vehicle. 743 F.3d 1152, 1154 (8th Cir. 2014). The trooper deployed his drug dog around the defendant's truck, but the dog did not successfully sniff the truck due to the smell of a dead animal in the ditch. *Id.* The trooper issued the defendant a warning ticket and allowed the defendant to leave. *Id.*

The trooper felt that the traffic stop did not "go the way a normal traffic stop should go" and called a Drug Enforcement Administration ("DEA") Task Force officer, describing the defendant's truck and travel route. *Id.* The DEA officer located the defendant and followed the defendant to a hotel parking lot. *Id.* The DEA officer called a local canine officer to perform a dog sniff. *Id.*

25

The canine officer deployed his dog for a drug sniff:

> The handling officer first directed [the dog] to conduct a "free air sniff" of several vehicles located in another part of the parking lot. In all, [the dog] sniffed four vehicles before reaching [the defendant's] truck. [The dog] did not alert, indicate, or otherwise change his behavior when sniffing the first four vehicles. When [the dog] finally reached the passenger side of [the Defendant's] truck, however, he "stop[ped] dead in his tracks and be[gan] to really detail the area between the bed of the truck and the cab of the truck." The handling officer characterized [the dog's] reaction as an "alert." The officer then pulled [the dog] away from [the defendant's] truck and directed him to sniff the vehicle parked next to [the defendant's] truck. [The dog] did not alert, indicate, or otherwise change his behavior while sniffing that vehicle. The handling officer then took [the dog] back to [the defendant's] truck and directed him to sniff the truck again. On this second sniff, [the dog] "stopped and detailed the same area as the first time." Based on [the dog's] two alerts to [the defendant's] truck, law enforcement obtained a search warrant. While executing the search warrant, officers found approximately 250 pounds of marijuana hidden inside two arc welders located in the bed of the truck.

*Id*. (seventh and eighth alterations in original).

Among other things, the defendant argued that the dog's "drug sniff did not provide probable cause for the search, and the automobile exception to the search warrant requirement did not apply under the circumstances present in this case." *Id*. at 1155. Specifically, for purposes of this case, the defendant contended that the dog's "drug sniff did not provide probable cause to search his vehicle" because the dog "only 'alerted' to the possible presence of drugs without actually 'indicating' the presence of drugs, and that a mere 'alert' is insufficient to support probable cause for a search." *Id*. at 1156.

The Eighth Circuit described the difference between an "alert" and an "indication" as follows:

> An "alert" occurs when a dog detects the odor of the drugs he is trained to locate. In this case, [the dog] gave two "alerts" by making two abrupt stops to detail a particular area of the truck with intense closed-mouth sniffing.

26

An "indication" occurs when a dog identifies the location of the strongest source of the drug odor. In this case, [the dog] was trained to sit or lie down when he had "indicated" the strongest source of the drug odor. [The dog] did not sit or lie down in this case.

*Id*. at 1156 n.3. In considering this issue, the Eighth Circuit determined that:

Some courts have held a trained drug dog's "alert," as opposed to the more conclusive "indication," is enough to establish probable cause. *See United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir.2009) ("Thus, the general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause. We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established."); *see also United States v. Clayton*, 374 Fed. App'x. 497, 502 (5th Cir.2010) ("[O]ur Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers. So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs."). Here, [the dog's] handling officer explained the dog's failure to give a full "indication" may have been because [the dog] was so overwhelmed by the odor of marijuana that he had difficulty pinpointing the strongest source of the odor. More to the point, the handling officer testified [the dog] gave two definitive "alerts" to the side of Holleman's truck. As a result, we are not concerned about [the dog's] failure to give a full indication[.]

*Id*. at 1156-57. The Eighth Circuit looked to the framework provided by *Harris* for determining "whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search." *Id*. at 1157. The Eighth Circuit stated that the "appropriate inquiry is 'whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.'" *Id*. (quoting *Harris*, 568 U.S. at 248). The Eighth Circuit also noted that the "Supreme Court also said 'evidence of a dog's satisfactory performance in a certification or training

27

program can itself provide sufficient reason to trust his alert.'" *Id.* (quoting *Harris*, 568 U.S. at 246).

The Eighth Circuit, applied the *Harris* framework in *Holleman*, and considering the totality of the circumstances, determined that:

> Here, the record showed [the dog] and his handler were first certified through the Northern Michigan K–9 school as a narcotics detection team in October 2009. [The dog] and his handler thereafter successfully completed annual re-certifications between the time of their initial certification and the search of [the defendant's] vehicle. . . .

> Finally, the totality of the facts involved in this case include the Trooper's suspicions about [the defendant] during the initial traffic stop on Interstate 80. The district court summarized the Trooper's suspicions as follows:

>> (1) Defendant failed to open the passenger side window more than one inch when Trooper Clyde first approached Defendant's truck; (2) Defendant provided a hesitant answer regarding where he was going; (3) Defendant had a Washington state license plate and stated that he was driving the arc welders in his truck to Washington D.C. but curiously stated that he was dropping off only one of the two arc welders in D.C. and that the other arc welder belonged to him; (4) Defendant's stated occupation—video producer—was inconsistent with the arc welders; and (5) Trooper Clyde believed that Defendant was displaying nervous energy and was breathing heavily.

> *United States v. Holleman*, No. 12–CR–40–LRR, 2012 WL 6201748 at *6 (N.D.Iowa Dec. 12, 2012).

> Considering "all the facts surrounding [the dog's] alert[s], viewed through the lens of common sense," we conclude those facts "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S.Ct. at 1058. We are thus satisfied [the dog's] sniffs were "up to snuff." *Id.*

28

*Holleman*, 743 F.3d at 1157-58; *see also Handley*, 2024 WL 1536750, at *7-*9 (applying the *Harris* framework as set forth in *Holleman*).

In *Pulido-Ayala*, after casting doubt on *Lyons* and the "instinctive dog actions" exception, the Eighth Circuit noted that "it is uncontroversial that if police had probable cause to search the care *before* the dog entered the interior, then any search effected by the entry was permissible." 892 F.3d at 319 (emphasis in original). The Eighth Circuit determined that:

> Here, the district court found that when Sergeant McGinnis commanded the canine to find drugs, the dog "immediately" pulled McGinnis toward the open passenger door. Given the strong reaction of the trained drug dog while it was *outside* the car, together with [the defendant's] suspicious reaction to the drug checkpoint, we conclude that police had probable cause to believe that the vehicle contained contraband in the moment *before* [the dog] actually crossed the threshold into the interior of the Mini Cooper. The dog's reaction outside [the defendant's] car distinguishes this case from [*United States v.*] *Winningham*, where the court affirmed the suppression of evidence when a police dog moved around the exterior of a car, entered through an open door, and "methodically sniffed" the vehicle's interior before alerting at a rear vent. 140 F.3d [1328,] 1330 [(10th Cir. 1998)].

*Id.* (emphasis in original).

In his testimony, Deputy Pothoff noted various behavior changes in Rico prior to his final indication, which occurred after his nose and head entered the open car window. Here, Deputy Pothoff took Rico to the front of Defendant's vehicle and gave Rico the command to sniff the vehicle. Rico walked quickly down the driver's side of the car and was directed back to the bottom of the driver's door by Deputy Pothoff. At the driver's side door, Rico took a deep breath at the bottom seam. Deputy Pothoff continued to move down the car, but Rico remained at the driver's side door sniffing. Rico then lifted his head and began moving up towards the open driver's door window. Rico left his

29

Case 2:24-cr-01026-LTS-MAR   Document 33   Filed 10/28/24   Page 29 of 40

front feet and stuck his nose and head inside the vehicle through the open driver's door window. (Def. Ex. A at 4:42-4:54.)

Deputy Pothoff testified that when Rico stayed at the driver's side door sniffing at the door instead of following him down the vehicle and when Rico turned and faced the vehicle with his chest toward the vehicle, these were changes in behavior that indicated Rico was "in the presence of the odor of a narcotic and that his full attention [was] on the vehicle in front of him." (Pothoff Hr'g Test. at 54.) Deputy Pothoff also testified that if Rico did not smell the odor of narcotics, he would have stayed parallel to the vehicle and not turned toward the vehicle with his chest facing the vehicle. (*Id.*) Further, Deputy Pothoff pointed out that Rico's nose went up and Rico left his front feet because the strongest point of the odor of narcotics was coming from above him and out of the open window. (*Id.* at 55-56, 59.) Deputy Pothoff also testified that when Rico leaves his front feet "it is almost always followed by a positive alert." (*Id.* at 71.) When asked whether Rico detected the odor of narcotics based on Rico's changes of behavior before Rico's nose and head broke the plane of the open window, Deputy Pothoff responded:

> In that sniff, hypothetically speaking, if time stopped, when his feet were about to hit that window, time just stopped, I can confidently say he is going to positively alert on that vehicle based on what I saw before and with his—him leaving his feet like that. Training with K-9 Rico, deployments with K-9 Rico, I know the dog, when he does that, he's in odor. He's going to alert. So, yeah, I'd be able to call it there.

(*Id.* at 78.)

In the instant case, the entire free air sniff took a total of twenty-eight seconds before Rico made his final indication. (Def. Ex. A at 4:42-5:10.) Significantly, the time from Deputy Pothoff directing Rico to sniff the bottom seam of the driver's side door to Rico placing his nose and head in the open window of the vehicle took approximately one to two seconds. (*Id.* at 4:53-54.) I do not doubt that by freezing the video Deputy Pothoff

can credibly identify Rico's behavioral changes consistent with smelling drugs prior to Rico's nose and head breaking the plane of Defendant's vehicle's open window. Nevertheless, the events transpired quickly in real time and Deputy Pothoff testified that he did not inform Investigator Leitzen or the other officers that Rico had alerted until after Rico sat, his final indication. (Pothoff Hr'g Test. at 79.)

In addition to Rico's changes in behavior which took place before Rico stuck his nose and head into the open window of the vehicle and constituting an alert, not a final indication, law enforcement knew the following information: (1) Immediately prior to going to the Lina Thai Bistro's parking lot to perform the dog sniff on Defendant's car, Deputy Pothoff was interviewing a woman he had arrested earlier that day and the woman told Deputy Pothoff that she had purchased illegal narcotics from Defendant in the past and had seen Defendant with large amounts of illegal narcotics in the past (Pothoff H'rg Test. at 62); (2) the woman also told Deputy Pothoff that Defendant was bringing a large amount of illegal narcotics to Dubuque on that day, January 27, 2024 (*id.*); (3) additionally, the woman told Deputy Pothoff that she knew Defendant bought illegal narcotics in bulk, typically a pound or more, and Defendant was moving that amount of weight daily or every other day (*id.*); (4) in late November 2023, CI1 told Investigator Leitzen that Defendant was coming to Dubuque from Madison, Wisconsin and selling large amounts of fentanyl pills from a house on Lemon Street in Dubuque (Leitzen Hr'g Test. at 4); (5) on January 20, 2024, CI2 told Investigator Leitzen that Defendant was selling "huge amounts" of methamphetamine in Dubuque and had observed Defendant with a gallon-size Ziploc bag full of methamphetamine on January 18, 2024 (*id.* at 6); (6) CI2 also told Investigator Leitzen that Defendant had been bragging about selling pounds of methamphetamine in Dubuque (*id.*); (7) CI2 stated that Defendant's supplier was a female who lived two hours away (*id.*); (8) on January 22, 2024, CI3 told Investigator Leitzen that Defendant was dealing "huge amounts" of methamphetamine in

Dubuque and openly bragged to CI3 about bringing 6 to 10 pounds of methamphetamine at a time to Dubuque from Madison, Wisconsin (*id.* at 8); (9) also on January 22, 2024, CI1 told Investigator Leitzen that Defendant was selling "large amounts" of methamphetamine in Dubuque and that Defendant's supplier in Platteville, Wisconsin had been arrested and Defendant started getting his drug supply from a girl in Wisconsin (*id.* at 10); (10) on January 24, 2024, CI1 told Investigator Leitzen that she had observed Defendant in possession of several ounces of methamphetamine (*id.*); (11) on January 26, 2024, CI1 contacted Investigator Leitzen and told him that Defendant had a large amount of cash and was getting ready to leave shortly for Madison, Wisconsin, to pick up a "large amount" of methamphetamine to bring back to Dubuque (*id.* at 11); (12) also on January 26, 2024, law enforcement identified the vehicle Defendant was driving and using a license plate reader determined that the vehicle was traveling eastbound on Highway 151 past Platteville, Wisconsin and heading toward Madison; (13) on January 27, 2024 in the late afternoon, law enforcement observed the vehicle back in Dubuque and identified Defendant as the driver of the vehicle; (14) the passenger in the vehicle told Investigator Leitzen that Defendant had picked her up in Madison and they returned to Dubuque earlier that day (January 27, 2024); (15) after the traffic stop was initiated and Deputy Boge first made contact with Defendant, Defendant did not identify himself or provide Deputy Bose with identification for approximately twenty minutes; (16) Defendant was also evasive in allowing law enforcement to contact the owner of the vehicle to ask the owner's consent to search the vehicle; and (17) Defendant was searched incident to arrest and Investigator Leitzen found $1,200 in Defendant's pants pocket and $1,485 in Defendant's wallet, which Investigator Leitzen believed was "highly likely" related to the drug trade.  (*Id.* at 22.)

This litany of pre-sniff probable cause along with the dog's behavior establish probable cause existed prior to the alleged trespass.  In *Holleman*, the dog did not provide

a final indication, but instead gave two "alerts," involving abrupt stops to detail a particular area of a vehicle with closed-mouth sniffing. In *Pulido-Ayala*, before the dog entered the vehicle, and after the dog was given the command to sniff, the dog "immediately pulled" the officer to the open vehicle door. In *Handley*, before the dog's nose crossed the plan of the vehicle's open window, the dog exhibited several changes of behavior, including aggressive sniffing and two head snaps. Here, before sticking his head in the open driver's door window, Rico detailed the seam of the driver's door, turned to face the driver's door, raised his head toward the open window, and left his front feet. Deputy Pothoff testified that when Rico leaves his front feet "it is almost always followed by a positive alert." (Pothoff Hr'g Test. at 71.) Deputy Pothoff explained that, based on his training and deployments with Rico, "I know the dog, when he does that, [leaves his front feet], he's in odor. He's going to alert." (*Id.* at 78.) Deputy Pothoff also testified that he had authorized a vehicle search short of Rico giving a final indication a "handful of times." (*Id.* at 72.) I find that the Rico's behavioral changes, particularly the fact that he left his front feet which is indicative of Rico being in the odor of illegal narcotics and a positive alert, is in line with *Holleman's* definitive alerts and *Pulido-Ayala's* "immediate pulling" as opposed to *Handley's* somewhat generic changes of behavior which merely suggested an alert. Additionally, Deputy Potoff testified he had authorized vehicle searches based on an alert from Rico without a final indication in the past as opposed to the officer in *Handley* who could not remember ever authorizing a vehicle search based on his dog's alert without a final indication.

Turning to the *Harris* framework, as outlined in *Holleman*, it is undisputed that Rico and Deputy Pothoff were initially trained over three months at Jessiffany Canine Services in Wisconsin and are both certified through the American Police Canine

Case 2:24-cr-01026-LTS-MAR   Document 33   Filed 10/28/24   Page 33 of 40

Association.[12]  As discussed above, prior to his final indication and prior to sticking his nose and head through the open driver's door window, Rico's changes of behavior constituted an alert consistent with the alert in *Holleman* and *Pulido-Ayala* and stronger than the alert in *Handley*.

Finally, in this case, law enforcement had been investigating Defendant for drug trafficking and had ample information that added to the assessment of probable cause. As outlined above, law enforcement had information from multiple confidential informants describing Defendant's routine, large-scale drug dealing in Dubuque. The sources also described Defendant's practice of obtaining drugs in Madison, Wisconsin to sell in Dubuque. It was also confirmed that Defendant left Dubuque on January 26, 2024, which was consistent with intelligence that he had gone to obtain drugs from his source in Madison, Wisconsin. Law enforcement knew that Defendant had travelled to Wisconsin on January 26, 2024, and Defendant's passenger reported to Investigator Leitzen that she and Defendant had returned to Dubuque on January 27, 2024[13] from Madison. In addition, Defendant's evasiveness regarding his identity and contacting the owner of the vehicle during the traffic stop, and Defendant having $2,685 cash on his person added to the existence of probable cause. This information is far more extensive than the information law enforcement knew in both *Holleman* and *Pulido-Ayala*. Thus, considering the totality of the circumstances, Rico's pre-final indication alert and the information known to law enforcement, when "viewed through the lens of common

---

[12] I note that the parties did not address the exact certification date(s) and there is no evidence in the record before me regarding exact certification date(s). However, Defendant did not argue that Rico and/or Deputy Pothoff were not properly certified at the time of the dog sniff.

[13] It was not clear when exactly Defendant and his passenger returned from Madison prior to the traffic stop. While it is possible Defendant could have stashed or sold all his drugs prior to the stop, the information from sources about Defendant's large-scale, routine drug dealing and Defendant's evasiveness counter that possibility sufficiently to support probable cause.

sense," I conclude that the facts in this case "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248. Accordingly, Rico's sniffs prior to sticking his nose and head through the open driver's window were "up to snuff." *Id*. Therefore, I recommend that the Court find that there was probable cause to search the vehicle before Rico's nose and head entered the open window and deny Defendant's motion to suppress.

### 3.    *Application of the exclusionary rule*

If the Court disagrees with me about the existence of probable cause, it may choose to address whether the exclusionary rule should apply under these circumstances. In *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court addressed the issue of whether to apply the exclusionary rule "when the police conduct a search in compliance with binding precedent that is later overruled." *Id*. at 232. The Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id*. The Supreme Court noted that in "a line of cases beginning with [*United States v.*] *Leon*, 468 U.S. 897 [(1984)], we . . . recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the 'flagrancy of the police misconduct' at issue." *Davis*, 564 U.S. at 238. The Supreme Court stated:

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring* [*v. United States*], 555 U.S. [135,] 143, 129 S.Ct. 695 [(2009)]. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.*, at 144, 129 S.Ct. 695. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, *supra*, at 909, 104 S.Ct. 3405 (internal quotation marks omitted), or when their conduct involves only simple, "isolated" negligence, *Herring*, *supra*, at 137, 129 S.Ct. 695, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way," *Leon*, *supra*, at 919, 908, n. 6, 104 S.Ct.

3405 (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

*Id*. The Supreme Court explained that:

> The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent. . . . Although the search turned out to be unconstitutional under *Gant*, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way. . . .
>
> Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis' claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." *Herring*, 555 U.S., at 144, 129 S.Ct. 695. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis' Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See ibid*. Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. *Ibid*. The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.
>
> Indeed, in 27 years of practice under *Leon's* good-faith exception, we have "never applied" the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct. *Herring*, *supra*, at 144, 129 S.Ct. 695. . . .
>
> Responsible law enforcement officers will take care to learn "what is required of them" under Fourth Amendment precedent and will conform their conduct to these rules. *Hudson* [*v. Michigan*], 547 U.S. [586,] 599, 126 S.Ct. 2159 [(2006)]. But by the same token, when binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than "'ac[t] as a reasonable

36

officer would and should act'" under the circumstances. *Leon*, 468 U.S., at 920, 104 S.Ct. 3405 (quoting *Stone* [*v. Powell*], 428 U.S. [465,] 539–540, 96 S.Ct. 3037 [(1976)] (White, J., dissenting)). . . .

We have stated before, and we reaffirm today, that the harsh sanction of exclusion "should not be applied to deter objectively reasonable law enforcement activity." [*Leon*, 468 U.S.] at 919, 104 S.Ct. 3405. Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

*Id.* at 239-41 (first and fifth alteration in original).

In *Handley*, Chief Judge Williams addressed *Davis*:

the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 564 U.S. 229, 232 (2011). Although the Eighth Circuit called the *Lyons* decision into question in *Pulido-Ayala*, 892 F.3d 315, the *Lyons* decision has never been overruled. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l] deterrence, and culpable enough to be 'worth the price paid by the justice system.'" *Id.*, at 240 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)) (alteration in original).

2024 WL 1536750, at *9.

Here, as noted by Chief Judge Williams in *Handley*, *Pulido-Ayala* did not overrule *Lyons*. In fact, there is no Eighth Circuit case overruling *Lyons*. I note that Defendant questions "whether *Lyons* survived *Jones*[.]" (Doc. 23-1 at 3.) However, *Jones* did not overrule *Lyons* and to the extent that *Pulido-Ayala* cast doubt on *Lyons*, it did not do so based on *Jones*. In fact, *Pulido-Ayala* does not even cite *Jones*. Further, neither *Jones* nor *Jardines* involved "instinctive actions." In *Jones*, law enforcement physically placed a GPS device on a target's vehicle to monitor the movements of the vehicle. Similarly, in *Jardines*, law enforcement physically directed the dog to the defendant's porch to sniff for drugs. In *Lyons* and in this case, law enforcement did not physically direct the dog into the defendant's vehicle. In both *Lyons* and in this case, the dog instinctively put its

37

nose and head through the open window of a stopped vehicle. Furthermore, since *Jones* was decided in January 2012, other courts have relied on *Lyons* and its holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d at 373. *See United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. July 27, 2012) (holding that "a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump"); *United States v. Chacon*, No. 4:23-cr-00064-SMR-WPK-6, 2023 WL 8364519, at *5 (relying on *Lyons* and finding that "there was no convincing evidence to show that the trooper directed the drug dog to make any physical contact with the vehicle" and "[a] review of the video footage instead supports the Government's position that the drug dog acted instinctively when the points of contact were made" and "[t]herefore, the drug dog unit's conduct during the open-air sniff did not infringe upon any Fourth Amendment rights"). Additionally, all the Circuits to have considered the issue of a police dog's instinctive acts in a drug sniff have all found that a dog that acts instinctively without direction or facilitation by the dog's handler does not violate the Fourth Amendment when the dog enters the interior of a vehicle during a sniff. *See United States v. Pierce*, 622 F.3d 209, 214-15 (3d Cir. 2010) (finding no Fourth Amendment violation where the dog acted instinctively without facilitation by the dog's handler after it entered a vehicle through an open door as the interior sniffs were "a natural migration from his initial exterior sniffs" that "did not constitute a search requiring a warrant or probable cause"); *United States v. Stone*, 866 F.3d 359, 364 (10th Cir. 1989) (holding that "the dog's instinctive actions did not violate the Fourth Amendment"); *United States v. Mostowicz*, 471 Fed. App'x 887, 890 (11th Cir. 2012) (holding that "a trained dog's instinctive acts—performed without police encouragement or facilitation—do not violate the Fourth Amendment.").

This case is distinguishable from *Buescher* regarding the application of the exclusionary rule where the Government argued that the magistrate judge:

> correctly found no police misconduct, as [the canine officer] did not act unreasonably or improperly, but in lawful accordance with his (and [the dog's]) training. . . . Therefore, the Government concludes, no legitimate interests would be advanced by excluding the evidence. However, [the dog]—as an instrumentality of the Government—intruded on a constitutionally protected space. Not only had [the dog] done this previously, but [the officer] suggested [his dog] is actually trained to do so. As such, applying the exclusionary rule will afford meaningful deterrence in the form of updated training and practices concerning the need to avoid physical intrusions into the interior of a vehicle during a canine sniff.

*Buescher* at *10. Thus, *Buescher* did not address the arguments above regarding the officers' reliance on *Lyons's* continued viability. Significantly, there is no evidence that Rico was trained to enter vehicles as was the dog in *Buescher*.

It is indisputable that the officers in this case did not violate Defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See Davis*, 564 U.S. at 240. Deputy Pothoff did not direct Rico into the vehicle and there is no other evidence of misconduct or culpability on Deputy Pothoff's part. Because at the time of the search of Defendant's vehicle *Lyons* remained good law, "an officer who conducts a search in reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances." *Id.* at 241 (alteration in original) (quotation omitted). Accordingly, law enforcement could rely on *Lyons's* holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d at 373. Therefore, following *Davis*, I find that even if Rico's nose and head breaking the plane of Defendant's vehicle's open driver's door window constitutes a trespass and an unreasonable and illegal search, the exclusionary rule should not be applied as *Lyons* remained good law and Deputy Pothoff and the other officers acted in compliance with *Lyons*. *See Davis*, 564 U.S. at 241 ("Evidence obtained

39

during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."). Accordingly, I recommend that Defendant's motion to suppress be denied.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 23.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 28th day of October, 2024.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa