# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> HUNTER QUINN NEWBERRY, <br><br> Defendant. | No. CR24-1026-LTS-MAR <br><br> **ORDER ON REPORT AND RECOMMENDATION REGARDING MOTION TO SUPPRESS** |

## I. INTRODUCTION

This case is before me on a Report and Recommendation (R&R) (Doc. 33) in which United States Magistrate Judge Mark A. Roberts recommends that I deny defendant Hunter Newberry's motion (Doc. 23) to suppress. Newberry and the Government filed timely objections (Docs. 38, 39). Neither party filed a response and the time to do so has passed.

## II. BACKGROUND

### A. *Procedural History*

On August 6, 2024, the Grand Jury returned an indictment (Doc. 3) charging Newberry with possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) (Count 1). Newberry filed his motion (Doc. 23) to suppress on September 16, 2024, and the Government filed its resistance (Doc. 26) on September 23, 2024. Judge Roberts held a suppression hearing on October 1, 2024.[1] Doc. 28. The Government presented testimony from Dubuque Police Department Investigator Chad Leitzen and Dubuque County Deputy Sheriff Lucas Pothoff. *Id.* Judge Roberts also

---

[1] The hearing transcript is available at Doc. 37.

admitted Government Exhibit 1 and Defense Exhibit A into evidence. *Id*. He filed the R&R (Doc. 33) on October 28, 2024. Both parties filed objections (Docs. 38, 39) on November 8, 2024.

## B.   *Relevant Facts*

Section II of the R&R contains detailed findings of fact. Doc. 33 at 3-11. Neither party has raised objections to those findings. Docs. 38, 39. As such, they are incorporated herein and will be referenced as necessary in my discussion of the objections.

## III.   STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## IV. DISCUSSION

Newberry objects to the following conclusions in the R&R: (1) Probable cause existed before law enforcement K-9 Rico's nose and head entered the open window of Newberry's vehicle and (2) even if probable cause did not exist before Rico's nose and head entered the open window, the exclusionary rule does not apply. Doc. 38 at 1-6. The Government objects to Judge Roberts' conclusion that Rico's nose and head entering the open window constituted a warrantless and unreasonable search. Doc. 39 at 1-6. I will address these issues in turn.

### A. Was there an unreasonable search when Rico put his head and nose through Newberry's car window?

The Government argues that under *United States v. Lyons,* 486 F.3d 367 (8th Cir. 2007), "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." Doc. 39 at 1 (citing *Lyons*, 486 F.3d at 373). The Government contends that *Lyons* remains good law in this circuit and that, under *Lyons*, an unreasonable search did not occur when Rico put his head and nose through Newberry's car window. *Id*. In support of this argument, the Government reasons that *United States v. Pulido-Ayala*, 892 F.3d 315 (8th Cir. 2018), did not cite *United States*

3

*v. Jones,* 565 U.S. 400 (2012), or *Jardines v. Florida,* 569 U.S. 1 (2013), and did not decide the issue of whether a dog intruding on a car constitutes a search. Doc. 39 at 3. The Government goes on to argue that because these cases did not overrule *Lyons,* Judge Roberts' reliance on *United States v. Buescher,* 691 F. Supp. 3d 924 (N.D. Iowa 2023), and *United States v. Handley,* No. 23-CR-57-CJW-MAR, 2024 WL 15367505 (N.D. Iowa Apr. 9, 2024), was misplaced. Doc. 39 at 4-6.

I previously addressed the interaction between *Lyons, Jones, Jardines* and *Pulido-Ayala* in *United States v. Buescher,* 691 F. Supp. 3d 924 (N.D. Iowa 2023):

> [The parties'] arguments focus on three cases: *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007); *United States v. Jones*, 565 U.S. 400, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012); and *Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013). In *Lyons*, a canine stuck his head through an open passenger-side window and then sat down beside that door, indicating he "had found the strongest source of the odor of narcotics." *Lyons*, 486 F.3d at 370. The Eighth Circuit noted that the officer had not created the opportunity to breach the interior of the vehicle because the defendant had left the window down when he exited the vehicle. *Id.* at 373. The canine's handler had not directed the dog to break the plane, and "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *Id.* The court also found that the dog would have indicated on the vehicle even if he had not put his head through the open window, and therefore, "[g]iven the certainty that the course of action the police were pursuing at the time of the [dog sniff] would have led to discovery of the same evidence forthwith by unquestionably legal means, there is no reason to penalize the police for this accident by excluding evidence." *Lyons*, 486 F.3d at 373-74 (internal quotation marks omitted).
>
> In *Jones*, decided five years after *Lyons*, police officers attached a GPS tracker to the underside of the defendant's vehicle to monitor his movements. *Jones*, 565 U.S. at 401, 132 S. Ct. 945. The Supreme Court held this amounted to a common-law trespass onto the defendant's property such that a warrantless (and unreasonable) search had occurred. *Id.* at 405, 132 S. Ct. 945 ("It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth

4

Amendment when it was adopted."). The Court explained that its cases from the latter half of the 20th century had strayed from a property-based trespassory approach to the Fourth Amendment, instead focusing on whether a defendant had a reasonable expectation of privacy in the area searched by Government officials. *Jones*, 565 U.S. at 405-07, 132 S. Ct. 945. However, the Court noted that the question of whether a defendant had a reasonable expectation of privacy in a particular place did not supplant a person's right to be free from physical intrusions upon constitutionally protected areas. *Id*.

In *Jardines*, police officers deployed a drug-sniffing dog on a homeowner's porch without a warrant. *Jardines*, 569 U.S. at 4, 133 S. Ct. 1409. The Court held this amounted to an unreasonable search, as the officers trespassed onto the curtilage of the home by exceeding the scope of their license to the porch. *Id*. at 9-10, 133 S. Ct. 1409. The Court wrote:

> The [Fourth] Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred.
>
> By reason of our decision in *Katz,* property rights are not the sole measure of Fourth Amendment violations, but though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections when the Government does engage in a physical intrusion of a constitutionally protected area.
>
> That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Jardines*, 569 U.S. at 5, 133 S. Ct. 1409 (internal citations and quotation marks omitted).

\* \* \*

5

While the initial issue is the current status of *Lyons*, neither party has addressed *United States v. Pulido-Ayala*, 892 F.3d 315 (8th Cir. 2018). In that case, the Eighth Circuit stated:

> The use of a well-trained narcotics dog around the exterior of a vehicle that has been lawfully stopped "does not expose noncontraband items that otherwise would remain hidden from public view," *United States v. Place,* 462 U.S. 696, 707 [103 S. Ct. 2637, 77 L. Ed. 2d 110] (1983), and "generally does not implicate legitimate privacy interests." *Illinois v. Caballes,* 543 U.S. 405, 409 [125 S. Ct. 834, 160 L.Ed.2d 842] (2005). "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Id.* at 408 [125 S. Ct. 834] (quoting *United States v. Jacobsen,* 466 U.S. 109, 123 [104 S. Ct. 1652, 80 L. Ed. 2d 85] (1984)). Consequently, "[t]he use of the drug-sniffing dog on the exterior of a vehicle during a valid traffic stop" is not a search and "does not infringe upon any Fourth Amendment rights." *United States v. Williams,* 429 F.3d 767, 772 (8th Cir. 2005).
>
> The inside of a car, however, is typically a different story. Police ordinarily cannot search the interior of an automobile unless they have probable cause to believe that the vehicle contains contraband or other evidence of a crime. *California v. Carney,* 471 U.S. 386, 392 [105 S. Ct. 2066, 85 L. Ed. 2d 406] (1985); *United States v. Ross,* 456 U.S. 798, 823 [102 S. Ct. 2157, 72 L. Ed. 2d 572] (1982). A drug dog is an instrumentality of the police, and the actions of "an instrument or agent" of the government normally are governed by the Fourth Amendment. *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 614 [109 S. Ct. 1402, 103 L. Ed. 2d 639] (1989). It is foreseeable that trained canines will react instinctively to the scent of drugs, and Pulido–Ayala argues with some force that when police bring a dog to a scene with an open car door, and the dog enters a citizen's vehicle, the police have conducted a "search" within the meaning of the Fourth Amendment. *See United States v. Winningham,* 140 F.3d 1328, 1331 (10th Cir. 1998).

6

The government, citing prior decisions, suggests that if there is no "police misconduct," then the "instinctive action" of a trained police canine to enter a car does not violate the Fourth Amendment. In *United States v. Michael Lyons,* 957 F.2d 615 (8th Cir. 1992), this court did say that "[w]ithout misconduct by the police," a dog's "instinctive actions" in tearing open a package in an airline freight room did not constitute a "search." *Id.* at 617. In that case, however, the court continued by reasoning that the dog's alert alone, without the unintended opening of the package, would have given investigators probable cause to search the package, so the inevitable discovery doctrine justified admitting evidence of the package's contents. *Id.* Likewise, although *United States v. Kelvin Lyons,* 486 F.3d 367 (8th Cir. 2007), cited *Michael Lyons* for the proposition that "instinctive actions of a trained canine do not violate the Fourth Amendment," that decision too concluded that the challenged search inevitably would have occurred based on independent probable cause, even if the drug dog had not instinctively entered the defendant's vehicle. *Id.* at 373–74.

The district court thought the *Lyons* cases meant that "the officers' intent is dispositive," so that there was no search if Jampy acted instinctively and Sergeant McGinnis did not direct him to enter the car. But since the Lyons cases, the Supreme Court has emphasized that with two "limited exception[s]" for special-needs and administrative searches, the subjective intent of police officers is almost always irrelevant to whether an action violates the Fourth Amendment. *Ashcroft v. al-Kidd,* 563 U.S. 731, 736–37 [131 S. Ct. 2074, 179 L. Ed. 2d 1149] (2011) (internal quotation marks omitted). There is reason to doubt, therefore, whether the district court's reading of the *Lyons* cases endures.

We need not explore the problem further in this case, because it is uncontroversial that if police had probable cause to search the car before the dog entered the interior, then any search effected by the entry was permissible. No warrant is required to search a car with probable cause. *Carroll v. United States,* 267 U.S. 132, 149 [45 S. Ct. 280, 69 L. Ed. 543] (1925). Here, the district court found that when Sergeant McGinnis

7

> commanded the canine to find drugs, the dog "immediately" pulled McGinnis toward the open passenger door. Given the strong reaction of the trained drug dog while it was outside the car, together with Pulido–Ayala's suspicious reaction to the drug checkpoint, we conclude that police had probable cause to believe that the vehicle contained contraband in the moment before Jampy actually crossed the threshold into the interior of the Mini Cooper. The dog's reaction outside Pulido–Ayala's car distinguishes this case from *Winningham,* where the court affirmed the suppression of evidence when a police dog moved around the exterior of a car, entered through an open door, and "methodically sniffed" the vehicle's interior before alerting at a rear vent. 140 F.3d at 1330.

892 F.3d at 318-19.

Thus, the Eighth Circuit has expressed doubt about whether a canine acting "instinctively" remains relevant to the Fourth Amendment analysis. Based on *Pulido-Ayala*, *Jones* and *Jardines*, it is not apparent that a canine's instinctive actions will never violate the Fourth Amendment. As the Eighth Circuit noted in *Pulido-Ayala*, "[a] drug dog is an instrumentality of the police, and the actions of 'an instrument or agent' of the government normally are governed by the Fourth Amendment. *Pulido-Ayala*, 892 F.3d at 318 (8th Cir. 2018) (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989)). If a police officer's intent is normally irrelevant to a constitutional inquiry, *see, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 736, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011), it is not clear why a canine's indiscernible motives would define the contours of an individual's right to be free from Government intrusion.

\* \* \*

I find, as *Pulido-Ayala* suggests, that *Lyons* is not determinative. While some courts have found no Fourth Amendment violation when a drug-sniffing dog breaks the plane of an open window, those decisions were largely prior to *Jones* and *Jardines*. *See United States v. Pierce*, 622 F.3d 209, 214-15 (3d Cir. 2010) ("And we apply the considerable body of jurisprudence examined above to conclude that [the K-9 officer's] interior sniffs, as a natural migration from his initial exterior sniffs, did not

8

constitute a search requiring a warrant or probable cause."); *United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010) (finding no Fourth Amendment violation where the drug-sniffing dog alerted on the vehicle before entering through its window and the handler had not prompted the dog to do so); *Sharp*, 689 F.3d 616, 619-20 (6th Cir. 2012) (see above); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989) ("We agree with the district judge that the dog's instinctive actions did not violate the Fourth Amendment. There is no evidence, nor does Stone contend, that the police asked Stone to open the hatchback so the dog could jump in."); *United States v. Mostowicz*, 471 Fed. Appx. 887 (11th Cir. 2012) (unpublished opinion) (see above); *but see United States v. Guidry*, 817 F.3d 997, 1006 (7th Cir. 2016) (finding the sniff search to be lawful because at the time the dog's head entered the vehicle, officers had probable cause to search it).

\* \* \*

Returning to *Jones* and *Jardines*, "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred. *Jardines*, 569 U.S. at 5, 133 S. Ct. 1409. "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment." *Jones*, 565 U.S. at 404, 132 S. Ct. 945. Intrusion may include a mere touching (such as the tracking device in *Jones*) or by exceeding a license to a place (such as the bringing a drug-sniffing dog to the curtilage of a home in *Jardines*). However, it must be accompanied by the intent to gather information.

Here, there is no doubt that a physical intrusion occurred. Indeed, before his final alert, K-9 Gus was actually dangling out of Buescher's window[.]

\* \* \*

Kerr himself would not have been constitutionally permitted to enter the vehicle without a warrant. *See California v. Carney*, 471 U.S. 386, 392, 105 S. Ct. 2066, 85 L.Ed.2d 406 (1985). Similarly, K-9 Gus' entry into the open window was a trespass with an intent to obtain information. While canine sniffs enjoy *suis generis* status (*Caballes*, 543 U.S. at 409, 125 S. Ct. 834), they are not exempted from a trespass analysis under *Jardines*. As the *Jones* Court stated: "It is important to be clear about what occurred in this case: The Government physically occupied private property for the

9

purpose of obtaining information." *Jones*, 565 U.S. at 404, 132 S. Ct. 945. The same conduct occurred here. As such, I find the Government conducted a warrantless and unreasonable search of Buescher's vehicle by allowing K-9 Gus to insert his head into the open window of that vehicle.

*Buescher,* 691 F. Supp. 3d at 930-39 (internal footnotes omitted).

The Government argues that Pothoff did not order Rico to search inside Newberry's vehicle. Doc. 39 at 5-6. It further argues that a dog cannot have the purpose to make its actions a trespass, but rather that purpose must come from the officer and, because Pothoff did not possess that purpose, no search occurred. *Id*. However, as I noted in *Buescher,* "[i]f a police officer's intent is normally irrelevant to a constitutional inquiry, *see, e.g., Ashcroft v. al-Kidd,* 563 U.S. 731, 736 (2011), it is not clear why a canine's indiscernible motives would define the contours of an individual's right to be free from Government intrusion." *Buescher,* 691 F. Supp. 3d. at 935.

I remain convinced by my holding and analysis in *Buescher*. As such, Pothoff's absence of intent to direct Rico into Newberry's car does not exempt the Government from a Fourth Amendment inquiry. Further, I agree with Judge Roberts that, as in *Buescher* and *Handley,* Rico's intrusion into Newberry's vehicle was for the purpose of obtaining information, as he had been commanded by Pothoff to seek drugs and breached the interior of the vehicle during that assignment. *Buescher,* 691 F. Supp. 3d at 939; *Handley,* 2024 WL 1536750 at *7**.** Thus, because Rico breached the interior of Newberry's vehicle while attempting to obtain information, I find that a search occurred. The Government's objection is thus **overruled** to the extent it asserts that a warrantless search did not occur. However, as explained further below, law enforcement had probable cause to search Newberry's vehicle before this warrantless search occurred. For that reason, the Government's objection to the R&R is **sustained** to the extent that the R&R refers to an "unreasonable" search.[2]

---

[2] The R&R uses the same language of "warrantless and unreasonable search" as in *Buescher* and *Handley*. However, in those cases, probable cause did not exist prior to the warrantless search,

10

## B. Did probable cause exist prior to Rico's search?

Newberry first objects to Judge Roberts' finding that law enforcement had probable cause to search his vehicle before Rico breached the interior with his head and nose. Doc. 38 at 1. Newberry argues that the confidential informants who formed part of the basis for a finding of probable cause were unreliable because (1) their ongoing drug cases incentivize them to lie to help themselves and (2) two of the confidential informants continue to be involved with illegal drugs. *Id.* at 1-2. Newberry further argues that Rico's behavior prior to breaching the interior of Newberry's vehicle was "insufficient, even coupled with the information from the informants, to establish probable cause for a search[.]" *Id.* at 3.

If law enforcement has probable cause to search a vehicle before a K-9 enters that vehicle, "any search effected by the entry [is] permissible." *Pulido-Ayala,* 892 F.3d at 319. To determine "whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search[,] [t]he appropriate inquiry is 'whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.'" *United States v. Holleman,* 743 F.3d 1152 (8th Cir. 2014) (quoting *Florida v. Harris,* 568 U.S. 237, 248 (2013)). In the R&R, Judge Roberts accurately set forth the standards applied by the Eighth Circuit in determining whether a "sniff is up to snuff". *See* Doc. 33 at 25-29. I will summarize those standards below.

In *Holleman,* the Eighth Circuit analyzed the circumstances surrounding a K-9 sniff, in relevant part, as follows:

---

thus making the searches unreasonable. *See Buescher,* 691 F. Supp. 3d at 939; *Handley,* 2024 WL 1536750, at *7. In *Pulido-Ayala,* in holding that the warrantless intrusion into defendant's vehicle was permissible due to the presence of probable cause, the court did not refer to the search as unreasonable. *See, e.g., Pulido-Ayala,* 892 F.3d at 319.

11

> Here, the record showed [the dog] and his handler were first certified through the Northern Michigan K–9 school as a narcotics detection team in October 2009. [The dog] and his handler thereafter successfully completed annual re-certifications between the time of their initial certification and the search of [the defendant's] vehicle. . . .
>
> Finally, the totality of the facts involved in this case include the Trooper's suspicions about [the defendant] during the initial traffic stop on Interstate 80. The district court summarized the Trooper's suspicions as follows:
>
>> (1) Defendant failed to open the passenger side window more than one inch when Trooper Clyde first approached Defendant's truck; (2) Defendant provided a hesitant answer regarding where he was going; (3) Defendant had a Washington state license plate and stated that he was driving the arc welders in his truck to Washington D.C. but curiously stated that he was dropping off only one of the two arc welders in D.C. and that the other arc welder belonged to him; (4) Defendant's stated occupation—video producer—was inconsistent with the arc welders; and (5) Trooper Clyde believed that Defendant was displaying nervous energy and was breathing heavily.
>
> *United States v. Holleman,* No. 12–CR–40–LRR, 2012 WL 6201748 at *6 (N.D. Iowa Dec. 12, 2012).
>
> Considering "all the facts surrounding [the dog's] alert[s], viewed through the lens of common sense," we conclude those facts "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris,* 133 S. Ct. at 1058. We are thus satisfied [the dog's] sniffs were "up to snuff." *Id.*

*Holleman,* 743 F.3d at 1157-58.

In holding that law enforcement possessed probable cause prior to a K-9 breaching the interior of a defendant's vehicle, the Eighth Circuit in *Pulido-Ayala* reasoned:

> Here, the district court found that when Sergeant McGinnis commanded the canine to find drugs, the dog "immediately" pulled McGinnis toward the open passenger door. Given the strong reaction of the trained drug dog while it was *outside* the car, together with [the defendant's] suspicious reaction to the drug checkpoint, we conclude that police had probable cause

to believe that the vehicle contained contraband in the moment *before* [the dog] actually crossed the threshold into the interior of the Mini Cooper. The dog's reaction outside [the defendant's] car distinguishes this case from *[United States v.] Winningham*, where the court affirmed the suppression of evidence when a police dog moved around the exterior of a car, entered through an open door, and "methodically sniffed" the vehicle's interior before alerting at a rear vent. 140 F.3d [1328,] 1330 [(10th Cir. 1998)].

*Pulido-Ayala,* 892 F.3d at 319.

Conversely, in *United States v. Handley,* No. 23-CR-57-CJW-MAR, 2024 WL 1536750 (N.D. Iowa Apr. 9, 2024), the court held that the police did not possess probable cause prior to a K-9 breaching the interior of a vehicle during a drug sniff. The court noted the K-9's training and certification, as well as the K-9's pre-indication changes of behavior but was unconvinced that these "untrained" behaviors could substitute for a trained indication. *Id.* at *8. Further, the officer in *Handley* testified that he could not remember ever authorizing a search based on pre-indication behavior. *Id.* Finally, the court reasoned that, unlike in *Holleman,* the officers did not have credible suspicions about the defendant during the initial traffic stop. *Id.* at *9. The court was unconvinced that defendant's alleged shaking and the smell of marijuana weighed in favor of probable cause because the defendant denied shaking, the shaking was not visible on camera and the officers admitted that the marijuana smell could not be pinpointed to the defendant's vehicle. *Id*.

In holding that an unreasonable search occurred in *Buescher,* I noted that the K-9's only "tell" in that case was breaching the interior of the vehicle. *Buescher,* 691 F. Supp. 3d. at 935. That case was also devoid of any indicia of probable cause independent of the K-9's indication after breaching the interior of the vehicle. *Id.* at 937, n. 11.

The present case is more akin to *Holleman* and *Pulido-Ayala* than *Buescher* and *Handley*. Judge Roberts described Rico's behavior as follows in the R&R: "Here, before sticking his head in the open driver's door window, Rico detailed the seam of the driver's door, turned to face the driver's door, raised his head toward the open window, and left

13

his front feet." Doc. 33 at 33. Pothoff testified that "I know the dog, when he does that, [leaves his front feet], he's in odor. He's going to alert." Doc. 37 at 78.

I agree with Judge Roberts that Pothoff's testimony regarding Rico's behavior is credible, especially coupled with Pothoff's and Rico's training and certification. As such, I am persuaded by Pothoff's testimony that he had authorized previous vehicle searches based on pre-indication alerts. *Id.* at 72. I further agree with Judge Roberts that Rico leaving his front feet is a far more decisive indication than the "somewhat generic" behavior at issue in *Handley*. Doc. 33 at 33. Rico leaving his front feet in this case is also distinguishable from the K-9 in *Buescher,* as that K-9 did not exhibit changes in behavior prior to breaching the interior of the car. *Buescher,* 924 F. Supp. 3d at 935.

Nonetheless, this would be a close case if the only indicia of probable cause were based on Rico's behavior. In fact, officers already possessed significant information about Newberry and his vehicle prior to the K-9 sniff. As Judge Roberts explained:

> (1) Immediately prior to going to the Lina Thai Bistro's parking lot to perform the dog sniff on Defendant's car, Deputy Pothoff was interviewing a woman he had arrested earlier that day and the woman told Deputy Pothoff that she had purchased illegal narcotics from Defendant in the past and had seen Defendant with large amounts of illegal narcotics in the past (Pothoff H'rg Test. at 62); (2) the woman also told Deputy Pothoff that Defendant was bringing a large amount of illegal narcotics to Dubuque on that day, January 27, 2024 *(id.)*; (3) additionally, the woman told Deputy Pothoff that she knew Defendant bought illegal narcotics in bulk, typically a pound or more, and Defendant was moving that amount of weight daily or every other day *(id.)*; (4) in late November 2023, CI1 told Investigator Leitzen that Defendant was coming to Dubuque from Madison, Wisconsin and selling large amounts of fentanyl pills from a house on Lemon Street in Dubuque (Leitzen Hr'g Test. at 4); (5) on January 20, 2024, CI2 told Investigator Leitzen that Defendant was selling "huge amounts" of methamphetamine in Dubuque and had observed Defendant with a gallon-size Ziploc bag full of methamphetamine on January 18, 2024 *(id.* at 6); (6) CI2 also told Investigator Leitzen that Defendant had been bragging about selling pounds of methamphetamine in Dubuque *(id.)*; (7) CI2 stated that Defendant's supplier was a female who lived two hours away *(id.)*; (8) on January 22, 2024, CI3 told Investigator Leitzen that Defendant was dealing "huge amounts" of methamphetamine in Dubuque and openly bragged to

14

> CI3 about bringing 6 to 10 pounds of methamphetamine at a time to Dubuque from Madison, Wisconsin (*id.* at 8); (9) also on January 22, 2024, CI1 told Investigator Leitzen that Defendant was selling "large amounts" of methamphetamine in Dubuque and that Defendant's supplier in Platteville, Wisconsin had been arrested and Defendant started getting his drug supply from a girl in Wisconsin (*id.* at 10); (10) on January 24, 2024, CI1 told Investigator Leitzen that she had observed Defendant in possession of several ounces of methamphetamine (*id.*); (11) on January 26, 2024, CI1 contacted Investigator Leitzen and told him that Defendant had a large amount of cash and was getting ready to leave shortly for Madison, Wisconsin, to pick up a "large amount" of methamphetamine to bring back to Dubuque (*id.* at 11); (12) also on January 26, 2024, law enforcement identified the vehicle Defendant was driving and using a license plate reader determined that the vehicle was traveling eastbound on Highway 151 past Platteville, Wisconsin and heading toward Madison; (13) on January 27, 2024 in the late afternoon, law enforcement observed the vehicle back in Dubuque and identified Defendant as the driver of the vehicle; (14) the passenger in the vehicle told Investigator Leitzen that Defendant had picked her up in Madison and they returned to Dubuque earlier that day (January 27, 2024); (15) after the traffic stop was initiated and Deputy Boge first made contact with Defendant, Defendant did not identify himself or provide Deputy Bose with identification for approximately twenty minutes; (16) Defendant was also evasive in allowing law enforcement to contact the owner of the vehicle to ask the owner's consent to search the vehicle; and (17) Defendant was searched incident to arrest and Investigator Leitzen found $1,200 in Defendant's pants pocket and $1,485 in Defendant's wallet, which Investigator Leitzen believed was "highly likely" related to the drug trade. (*Id.* at 22.)

Doc. 33 at 31-32. This information far exceeds the information available to officers in advance of the K-9 sniffs in *Pulido-Ayala* and *Holleman*. *See Pulido-Ayala,* 892 F.3d at 317, 319 (only information known to police outside of K-9 behavior was defendant's suspicious behavior at drug checkpoint; court found that there was probable cause); *Holleman,* 743 F.3d at 1157 (information known to police outside of K-9 behavior was defendant's suspicious behavior throughout traffic stop; court found that there was probable cause).

15

Newberry argues that the confidential informants lack credibility due to their ongoing drug cases. However, the information they provided was consistent and was at least partially corroborated by the fact that Newberry's passenger stated that she and Newberry had returned from Madison, Wisconsin, on the day of the traffic stop, and each confidential informant had informed police about Newberry's travels between Madison and Dubuque. Doc. 33 at 34; *United States v. Winarske,* 715 F.3d 1063, 1067 (8th Cir. 2013). "[P]olice may deem an informant credible and make a finding of probable cause when an informant's information is at least partly corroborated."). The overwhelming amount of information known to law enforcement prior to the traffic stop, in combination with Rico's changes in behavior prior to the final indication, provided probable cause to search Newberry's vehicle before Rico breached the interior of the vehicle. As such, Newberry's objection to Judge Roberts' finding that probable cause existed before the warrantless search of his vehicle is **overruled.**

## C. *Application of the Exclusionary Rule*

Newberry next objects to Judge Roberts' conclusion that even if probable cause did not exist before Rico's search, the exclusionary rule should not be applied to that search. Doc. 38 at 3. In light of my determination that probable cause existed prior to Rico's search, this objection is moot. As such, I will decline to adopt Section III(C)(3) of the R&R on mootness grounds.

## V. CONCLUSION

1. For the reasons set forth herein, the Report and Recommendation (Doc. 33) is **adopted in part,** as modified herein.

2. The defendant's objections (Doc. 38) to the Report and Recommendation are **overruled**.

3. The Government's objections (Doc. 39) to the Report and Recommendation are **sustained in part** and **overruled in part.**

4. Defendant Hunter Newberry's motion to suppress (Doc. 23) is **denied**.

**IT IS SO ORDERED** this 26th day of November, 2024.

_____
Leonard T. Strand
United States District Judge